COMMONWEALTH *VS.* TIESON GONZALEZ.

No. 05-P-591.

Worcester. December 6, 2006. - April 6, 2007.

Present: CYPHER, SMITH, & KATZMANN, JJ.

*Homicide. Armed Assault with Intent to Murder. Practice, Criminal,* Confronta-
tion of witnesses, Argument by prosecutor. *Constitutional Law,* Confronta-
tion of witnesses. *Joint Enterprise. Evidence,* Joint enterprise, Wiretap,
Alibi, Argument by prosecutor. *Alibi. Witness,* Impeachment.

In a murder case, a Superior Court judge erred in admitting in evidence a non-
testimonial statement made by a witness who identified the defendant as
the driver of the motor vehicle from which the shot was fired that killed
the victim, where the witness was not available for cross-examination, and
his statement was not made in order to enable the police to meet an ongo-
ing emergency [626-627]; in light of the strong evidence of the defendant's
guilt, however, the error was harmless beyond a reasonable doubt
[627-628].

The evidence at a criminal trial was sufficient to permit the jury to conclude
that the defendant was guilty of murder in the second degree as either the
principal or a joint venturer [628], and of armed assault with intent to
murder [628-629].

The judge at a criminal trial properly denied the defendant's motion to sup-
press a tape recording of his conversation with a friend, where the rec-
ording was not made at the direction of the police and, in any event, was
not made secretly. [629]

Although the prosecutor's cross-examination of the defendant at a criminal
trial yielded an improper impeachment by silence, the error was not
prejudicial, where the evidence of the defendant's guilt was strong, the
reference to the defendant's prearrest silence did not affict his alibi defense,
the reference was brief and contained, and the defense had raised the issue
of the defendant's prearrest behavior. [629-632]

At a criminal trial, no error existed in the prosecutor's closing argument,
where he merely articulated a permissible and rational inference from the
evidence. [632]

INDICTMENTS found and returned in the Superior Court Depart-
ment on October 17, 2002.

A pretrial motion to suppress evidence was heard by *Peter W.
Agnes, Jr.,* J., and the cases were tried before *Francis R. Fecteau,*
J.

*Richard L. Goldman* for the defendant.

*Robert J. Bender,* Assistant District Attorney, for the Commonwealth.

CYPHER, J. A jury convicted the defendant, Tieson Gonzalez, of murder in the second degree (G. L. c. 265, § 1) and assault with intent to murder while armed with a dangerous weapon (G. L. c. 265, § 18[*b*]). On appeal, the defendant makes the following arguments: (1) the admission of a witness's statement to a police officer violated *Crawford* v. *Washington,* 541 U.S. 36 (2004); (2) the evidence was insufficient to establish joint venture; (3) the evidence was insufficient to establish armed assault with intent to murder; (4) the motion to suppress a telephone conversation tape recorded by one of the witnesses should have been allowed because the recording violated G. L. c. 272, § 99 (the wiretap act); (5) the prosecutor improperly impeached the defendant with his silence; and (6) the prosecutor's closing argument referred to facts not in evidence. We affirm.

*Factual background.* We recite the facts the jury could have found in some detail to provide context for our decision.

1. *At the scene.* On August 24, 2001, Leominster police Officer Jose Algarin and at least two other police officers separately arrived at 209-211 Mechanic Street in response to a report of shots fired. Upon arrival, Algarin heard someone say, "[H]e's been shot." He radioed for an ambulance and more officers. Algarin saw Danny Rivera, whom he knew, and others running around. Algarin found Andrew Sierra, the victim, lifeless on his back in the driveway. He retrieved his medical bag from his cruiser. Upon returning to the victim, he saw Rivera, who was crying, trying to administer cardiopulmonary resuscitation. Algarin began chest compressions as Rivera performed mouth-to-mouth resuscitation. The emergency medical technicians soon arrived and took over. Algarin asked Rivera and the others whether they had seen anything. They replied "no."

Chad Connors, a bystander who had been waiting outside on Mechanic Street for a friend, testified that he saw a gray Jeep Cherokee sport utility vehicle drive slowly down the street. As the Jeep drove by, Connors heard shots coming from it. Con-

nors knew that the defendant drove a Jeep Cherokee; however, he could not say if the defendant was driving that night, as he was near the passenger side of the Jeep.

Connors tried to signal to Algarin that the taillights of the Jeep were still visible as it headed east toward Route 2. Officer Robert Quirk arrived, and Connors relayed to him the information regarding the Jeep; Quirk, in turn, relayed the information to the Leominster dispatcher. Officer Angel Amoros, who was with Quirk, knew the defendant and had seen him drive a Jeep Cherokee in the past.

Algarin spoke with Amoros and then took Rivera across the street and asked him to confirm that the defendant was driving the Jeep. Rivera stated, "Yes, it was. It was Tieson Gonzalez at the wheel." Rivera described the Jeep as a silver Jeep and told Algarin that if Algarin advised anyone else that Rivera had identified the driver, Rivera would deny it. Algarin transmitted the information he had received, and officers were dispatched to the defendant's address at 62½ Hazel Street.

2. *Further investigation on the day of the homicide.* Officer Kevin Boucher responded to the call to Hazel Street. He saw a Jeep backing out onto the street and noticed the driver, later identified as David DePascale, stiffen as he signaled him to stop. Boucher called in his location and the plate number of the Jeep. Shortly thereafter, Officer James Farrell and Sergeant Christopher LeDoux arrived to assist Boucher. Boucher ordered DePascale to the rear of the Jeep. Farrell noticed a bulge in De-Pascale's pants, so he frisked him and found a wad of cash and a vial of more than thirty grams of "rock" cocaine. DePascale was arrested.

While searching the Jeep, Farrell saw the butt end of a handgun[1] between the passenger seat and center console. LeDoux seized the handgun.[2] The officers also recovered a wallet from the Jeep's dashboard. The wallet contained the defendant's Massachusetts driver's license, other identifying papers, and the defendant's Social Security card.

---

[1] DePascale's fingerprint was found on the magazine of the handgun.

[2] Ballistics tests showed that a shell casing found on the street near a vehicle and a projectile found just below a second floor window came from the handgun found in the Jeep.

LeDoux and another officer went to the defendant's apartment. Ileana Montalvo, the defendant's girl friend,[3] answered the door. LeDoux asked Montalvo whether the defendant was there. She hesitated for about five seconds and replied, "no." He asked her if she knew where the defendant was, and if she knew where the Jeep was. Montalvo stated that she did not know where the defendant was and that he had dropped off the Jeep at the shop that morning. LeDoux informed her that they had just stopped the Jeep in the driveway and asked her again if she knew where the defendant was. She said, "No. He's not here. He's in Maine." LeDoux asked if he could come in to take a look, but she declined.

LeDoux and other officers waited and more officers arrived to secure the perimeter. LeDoux received word that the victim had died. Sometime after 10:00 P.M., LeDoux and other officers searched the defendant's apartment for the defendant but did not locate him.

According to Montalvo, Sean "Shiz" Taylor was at Montalvo's home just before the police arrived. Montalvo described DePascale as a "very good" friend, "like a cousin" to the defendant.

3. *Testimony concerning the defendant's escape from the area.* Joline Constant, Taylor's girlfriend,[4] testified that on August 24, 2001, at around 9:15 P.M., the defendant's Jeep pulled up, and Taylor got in the back seat. About five to ten minutes later Taylor telephoned her and told her to pick him up at the defendant's house, which was approximately three minutes away. As she approached Hazel Street, she spotted the defendant by a playground near the defendant's house. She pulled over and looked for Taylor. The defendant was "sweating" and "nervous." He entered her car but said nothing. She asked him where Taylor was. The defendant told her that Taylor was at the house talking with police and that she should go back home and wait for him to call her again. She then drove back to her house with the defendant to wait for Taylor's call. Approximately ten minutes later when Taylor telephoned and

---

[3]Montalvo was married to the defendant at the time of trial.

[4]Joline Constant was married to Taylor at the time of trial.

requested that she pick him up, she discovered that the defendant had left.

4. *Testimony concerning admissions made by the defendant after the homicide.* A. *John McCall.* John McCall, who testified under a grant of immunity, described himself as a "good friend" of the defendant. According to McCall, perhaps two days after the shooting the defendant met with McCall's stepbrother Sean (not Sean "Shiz" Taylor).[5] The defendant told McCall that he was the one who had killed "Roach,"[6] that he knew he had hit the victim in the back, and that he saw him drop to the ground.[7] He also told him that the handgun was "cut up."

Sometime in October, 2001, the defendant asked McCall whether he could arrange to have DePascale murdered. McCall told the defendant that his former girl friend, Jessica Cochlin, was "with Hector [Negron]."[8] McCall told the defendant that he would speak with Cochlin and have her relay the request to Negron. McCall testified that he spoke with Cochlin approximately six times. According to McCall, the defendant offered to pay Negron $2,000 before the killing and $3,000 after the killing. The defendant also insisted on collateral: holding either Cochlin or her son until DePascale was killed. Negron did not accept the defendant's terms.[9]

B. *George Penniman.* George Penniman,[10] a friend of the defendant's, stated that the defendant told Penniman that, on the night in question, he, DePascale, and "Shiz," in Montalvo's car

---

[5]McCall's stepbrother Sean did the defendant's tattoos. The defendant corroborated this during his testimony.

[6]The medical examiner testified that the word "Roach" was tattooed on the victim's body.

[7]The defendant denied telling McCall that he shot the victim in the back.

[8]Negron was incarcerated at the same jail as DePascale. The defendant denied knowing Cochlin or Negron.

[9]Jessica Cochlin, who also testified under a grant of immunity, corroborated McCall's testimony. She authenticated audiotape recordings of her conversations with Negron while he was incarcerated.

[10]Penniman testified that he was aware of the defendant's concern about DePascale. He stated that he had overheard the defendant on the telephone say that he had to "get word to" people where DePascale was being held, because he was the only tie to this case. Tracey Perkins, Penniman's girl friend, corroborated Penniman's testimony. She testified that she had overheard the defendant and "Fred" talking about the case and about the disappearance of the gun.

and all armed, "drove up on the four kids and started shooting." The defendant told Penniman that he was sure that he had shot the victim because the others seemed to be shooting up into the air.[11] After the shooting, they returned to the defendant's house. DePascale did not want to give up his firearm because he was afraid of retaliation. As DePascale backed out of the driveway, he was stopped by the police.

The defendant told Penniman that he gave his brother his handgun, who took it to "Fred"[12]; Fred in turn "torched" it and dumped it in the Fitchburg River.[13,14] The defendant asked Penniman if he would be willing to provide an alibi for the murder, but Penniman declined. Penniman later learned from the defendant that the defendant's aunt in Rhode Island had agreed to provide an alibi for him.

5. *The arrest.* The defendant was arrested one year after the incident; he was climbing out the window of a motel room. The defendant's hair was dyed a light red or strawberry blonde color.

Detective Daniel Richard, who arrested the defendant, testified that the defendant told him that he was with a woman in Connecticut at the time of the murder.[15] The defendant said that he had telephoned Montalvo that night and instructed her to allow the police to search their home and that his attorney had told him of DePascale's statement and that he was concerned about facing murder charges.

6. *The defendant's case.* The defendant testified to the following at trial. He had been in Rhode Island at his aunt Robin Fowler's house at a tattoo party on the night of the incident. He never left his aunt's home. He did not know Penniman until a

---

[11]The defendant denied ever telling Penniman that he saw the victim fall when he hit him.

[12]Fred Thompson was a friend and coworker of the defendant.

[13]Penniman's testimony was corroborated by an audiotape he had made of a conversation he had with the defendant. The audiotape was played for the jury. Penniman gave the police the audiotape after he received a promise for a lesser sentence on the charges he was facing; he received a lesser sentence.

[14]During his testimony, the defendant authenticated the edited audiotape of a conversation between him and Penniman.

[15]The defendant testified that he was with a woman named "Marie" who had taken him to Rhode Island. Marie was unable to be located and did not testify.

month or so after the incident when he met him at a dog show. He had known McCall when he was sixteen years old but he had never "hung" with him. He had known DePascale since they were children and they were like "cousins." He drove the Jeep on a regular basis and sometimes loaned it to DePascale. The handgun that he had claimed to have disposed of was Penniman's firearm, not his.

Fowler and Montalvo testified that the defendant was at Fowler's house in Woonsocket on the night of the murder. However, Fowler initially told police that she had been out that night and did not see the defendant until arriving home later that evening. When Fowler was interviewed again by police, she corrected herself, stating that they had a tattoo party at her house and that the defendant was there. Montalvo admitted that she asked both Fowler and Monique Barnes if they remembered the tattoo party that Friday night in Rhode Island. Montalvo also admitted that she had corrected Barnes the weekend before trial, stating that the party was August, 2001, not 2002.[16]

*Discussion.* 1. *Confrontation clause*[17] *issue.* The defendant argues that Rivera's statement to Officer Algarin that the defendant was at the wheel of the silver Jeep should not have been admitted as an excited utterance because it was the product of reflection. The defendant objected at trial on the ground that the admission of the statement violated the principles established in *Crawford* v. *Washington*, 541 U.S. 36 (2004). We review to determine whether there was error and, if so, whether it was harmless beyond a reasonable doubt. *Commonwealth* v. *Galicia*, 447 Mass. 737, 746 (2006).

We conclude that it was error to admit Rivera's statement. Rivera did not testify and was not, therefore, available for cross-examination. After telling the police that the shots came from a silver Jeep driven by the defendant, Rivera added that he would deny the statement if Officer Algarin told anyone. This additional caveat indicates that Rivera's statement was a product of reflection and, despite the fact that he had been crying earlier,

---

[16]Barnes testified that after speaking with Montalvo, who corrected her by stating that the party was 2001, Barnes looked at her 2001 planner and, when she noticed that there was no entry for the party, wrote in the entry.

[17]Pursuant to the Sixth Amendment to the United States Constitution.

was not an excited utterance. *Commonwealth* v. *Santiago*, 437 Mass. 620, 623 (2002).

The Commonwealth attempts to categorize the statement as outside the parameters of *Crawford* by arguing that Rivera's statement was admissible as a nontestimonial statement made in order to enable the police to meet an ongoing emergency. *Davis* v. *Washington*, 126 S. Ct. 2266, 2273-2274 (2006). *Commonwealth* v. *Gonsalves*, 445 Mass. 1, 3 (2005), cert. denied, 126 S. Ct. 2980 (2006). Here, however, it does not appear that Algarin's questioning of Rivera was directed at securing the crime scene or at obtaining medical care. Compare *Commonwealth* v. *Foley*, 445 Mass. 1001, 1002 (2005), cert. denied, 126 S. Ct. 2980 (2006); *Commonwealth* v. *Rodriguez*, 445 Mass. 1003, 1003 (2005), cert. denied, 126 S. Ct. 2979 (2006). Although Algarin was the first officer to arrive at the scene and initially provided medical care to the victim, by the time Algarin posed the question to Rivera, Algarin was investigating the crime.

We must then decide whether the error, which is of constitutional dimension, is harmless beyond a reasonable doubt. In making this determination, we consider factors such as "the importance of the evidence in the prosecution's case; the relationship between the evidence and the premise of the defense; who introduced the issue at trial; the frequency of the reference; whether the erroneously admitted evidence was merely cumulative of properly admitted evidence; the availability or effect of curative instructions; and the weight or quantum of evidence of guilt." *Commonwealth* v. *Dagraca*, 447 Mass. 546, 553 (2006).

Here, although the prosecutor referred to the improperly admitted evidence in closing argument, the improperly admitted evidence was cumulative of other evidence, and the quantum of proof against the defendant was so substantial that the error was harmless beyond a reasonable doubt. Specifically, the evidence included the following facts: the police located and arrested David DePascale in a silver Jeep Cherokee in the defendant's driveway; there was a firearm between the passenger seat and the center console; the firearm was linked to the murder scene by ballistics; the defendant's wallet was found on the dashboard

near the steering wheel; there were no fingerprints on the steering wheel; the defendant admitted to George Penniman and John McCall, on separate occasions, that he shot and killed the victim; the defendant also told them that he had the murder weapon destroyed by Fred Thompson at his garage; the defendant conspired to have DePascale killed because he was concerned about what DePascale would tell authorities; Joline Constant's testimony contradicted the defendant's alibi that he was in Rhode Island at the time of the homicide; and there was evidence that the defendant fabricated his alibi.

In light of such strong evidence of guilt, the Commonwealth's use of the improperly admitted evidence was harmless beyond a reasonable doubt.

2. *Sufficiency of the evidence: joint venture.* The defendant also argues that the evidence was insufficient for the jury to conclude that the defendant was guilty as a joint venturer and that the verdict slip did not require the jury to indicate a specific theory of guilt. There was no error. The trial judge was not required to ask the jury whether they convicted the defendant as a principal or a joint venturer. *Commonwealth* v. *Ellis*, 432 Mass. 746, 761 (2000). *Commonwealth* v. *Santos*, 440 Mass. 281, 290 (2003). Indeed, the Supreme Judicial Court has rejected the argument that the jury must be unanimous as to whether guilt is based on liability as a principal or joint venturer. *Ibid.* In any event, the evidence was sufficient to convict the defendant as either the principal or as a joint venturer.[18]

3. *Sufficiency of the evidence: armed assault with intent to murder.* The defendant argues that the evidence was insufficient to establish that he assaulted anyone other than the victim. To prove armed assault with intent to murder, the Commonwealth was required to prove that "the defendant committed an assault, that he was armed with a dangerous weapon, and that he had the specific intent of murdering the victim in assaulting him." *Commonwealth* v. *Lopez*, 383 Mass. 497, 500 (1981). *Com-*

---

[18]If the jury chose to disbelieve the testimony of both Penniman and McCall, the jury could have concluded, from the evidence presented, that one of the other occupants of the Jeep (not the defendant) fired the shot that killed the victim and that the defendant was a participating gunman, or joint venturer.

*monwealth v. Gordon,* 41 Mass. App. Ct. 459, 465 (1996). The evidence was sufficient. There was evidence that there were people in addition to the victim in the driveway, that multiple shots were fired, and that the defendant admitted to George Penniman that he and others in the Jeep "drove up on the four kids and started shooting." Compare *Commonwealth* v. *Gordon,* 41 Mass. App. Ct. at 464 (sufficient evidence of assault with intent to murder where evidence showed defendant fired gun and took "a shot at police").

4. *Admission of the telephone conversation recorded by Penniman.* Prior to trial, the defendant moved to suppress the tape recording of his conversation with George Penniman, detailed *supra.* After an evidentiary hearing, the motion judge issued findings of fact and conclusions of law and denied the motion. The defendant argues that the motion judge should have granted his motion to suppress the recording Penniman made of the defendant's telephone call to him because it violated the wiretap act. The motion judge found that the recording was not made at the direction of the police and, in any event, was not made secretly. Therefore, the judge concluded that the exclusionary rule should not apply. We accept the judge's findings of fact absent clear error, and we review the judge's conclusion of law de novo.

There appears to be ample support in the record for the judge's factual findings. In addition, we agree with the judge's legal conclusion that the exclusionary rule ought not to be applied. See *Commonwealth* v. *Santoro,* 406 Mass. 421, 423 (1990); *Commonwealth* v. *Barboza,* 54 Mass. App. Ct. 99, 104-105, cert. denied, 537 U.S. 887 (2002).

5. *Cross-examination of the defendant.* The defendant presented an alibi defense at trial. His wife, his aunt, and the defendant all testified that the defendant was in Rhode Island at the time of the murder in Leominster. During direct examination, defense counsel elicited from the defendant that on the night of the shooting, the defendant's wife had telephoned him on his cellular telephone and told him that he was a suspect in a homicide and that the police were looking for him. The defendant testified that he spoke with his wife several times after that and that he also telephoned his attorney. In addition,

the defendant testified that between the time of the homicide and the time he was apprehended, he had been in contact with his attorney and had asked him what would happen if he turned himself in.

On the prosecutor's cross-examination of the defendant, the following exchange occurred:

> *Q.:*  "Okay. And you're [in Rhode Island] with others, and you find out that you are a suspect in a homicide that happened that night?"
>
> *A.:*  "Yes."
>
> *Q.:*  "And you immediately told [your wife], have the Fitchburg police call the Woonsocket Police because here I am?"
>
> *A.:*  "No, I did not."
>
> *Q.:*  "I [the defendant] could not have done it?"
>
> *A.:*  "No, I did not."
>
> *Q.:*  "You didn't do that?"
>
> *A.:*  "No."
>
> *Q.:*  "Well, you yourself went directly to the Woonsocket Police Department and said, look, they want me in a murder up in Fitchburg, but I couldn't have been there because I am right here?"
>
> *A.:*  "No."

Defense counsel then lodged an objection, pointing out that the defendant had no obligation to turn himself in, and although the judge did not sustain the objection, the judge suggested that the prosecutor "steer away from" the line of inquiry. The line of inquiry was not pursued.

On appeal, the defendant argues that this constituted improper impeachment by silence. Although a defendant's prearrest silence may be used as an adoptive admission, the "impeachment of a defendant with the fact of his prearrest silence should

be approached with caution." *Commonwealth* v. *Nickerson,* 386 Mass. 54, 62 (1982). *Commonwealth* v. *Thompson,* 431 Mass. 108, 117, cert. denied, 531 U.S. 864 (2000). "[W]henever [such impeachment] is undertaken, it should be prefaced by a proper demonstration that it was 'natural' to expect the defendant to speak in the circumstances." *Commonwealth* v. *Nickerson, supra.*

Here, the prosecutor did not establish a foundation that it would have been "natural" for the defendant to contact the police. In fact, the defendant's testimony in direct examination demonstrated the contrary, conveying to the jury that the defendant had consulted his attorney and then had not made contact with the police. In such circumstances, it cannot be said that contacting the police on the night of the shooting would have been a "natural" response. Compare *Commonwealth* v. *Haas,* 373 Mass. 545, 560 (1977), *S.C.,* 398 Mass. 806 (1986) (not "natural" for defendant *"not accused* of the commission of a particular crime to deny complicity in the crime"), *Commonwealth* v. *Nickerson,* 386 Mass. at 60 (it would not be "natural" for defendant "to come forward and produce incriminating evidence against himself" by reporting crime and identifying attacker), and *Commonwealth* v. *Aparicio,* 14 Mass. App. Ct. 993 (1982) (not "natural" for defendant to come forward where doing so would have shifted blame to other members of the household), with *Commonwealth* v. *Barnoski,* 418 Mass. 523, 536 (1994) (defendant's failure to summons help for the victim appropriate subject for cross-examination).

In determining whether the error was nonprejudicial, we consider whether there is a reasonable possibility that the error might have contributed to the jury's verdict. See, e.g., *Commonwealth* v. *Correia,* 65 Mass. App. Ct. 597, 604 (2006). See also *Commonwealth* v. *Alphas,* 430 Mass. 8, 23 (1999). We are confident that the error was nonprejudicial. Here, the reference did not affect the alibi defense. Further, the jury's attention had been drawn to the defendant's post-shooting, prearrest behavior by the defense. The reference to the issue was brief and contained. "[T]his testimony was a brief event in the course of a long trial." *Commonwealth* v. *Thompson,* 431 Mass. at 117, quoting from *Commonwealth* v. *Grenier,* 415 Mass. 680, 690 (1993).

The evidence of guilt, as discussed earlier, was strong.

6. *Closing argument.* The defendant argues that the prosecutor improperly suggested in closing argument that he was aware of facts not in evidence regarding DePascale's statement and that the judge should not have denied his motion for a mistrial. The defendant objected, so we review to consider whether the error, if any, was prejudicial. We detect no error; the prosecutor merely articulated a permissible and rational inference from the evidence. *Commonwealth* v. *Kozec,* 399 Mass. 514, 516 (1987). The judge properly denied the defendant's motion for a mistrial.

*Judgments affirmed.*