COMMONWEALTH *vs.* JOHN R. IRWIN.

No. 07-P-956.

Norfolk. April 7, 2008. - September 15, 2008.

Present: McHUGH, KATZMANN, & GRAINGER, JJ.

*Indecent Assault and Battery. Evidence,* Consciousness of guilt, Impeachment of credibility, Admission by silence. *Witness,* Impeachment, Self-incrimination. *Constitutional Law,* Self-incrimination.

At the trial of a criminal complaint charging the defendant with indecent assault and battery on a child under fourteen, the Commonwealth's use (in its case-in-chief, in cross-examination, and in closing argument) of the defendant's failure to reach out to police and his delay in speaking to them — as evidence of consciousness of guilt — was improper under common-law rules of evidence and violated the defendant's privilege against self-incrimination, and amounted to a substantial risk of a miscarriage of justice requiring the reversal of the conviction, the setting aside of the verdict, and a remand of the case to permit a new trial. [648-656]

COMPLAINT received and sworn to in the Quincy Division of the District Court Department on January 26, 2004.

The case was tried before *Paul V. Buckley,* J.

*Edward J. O'Brien* for the defendant.

*Varsha Kukafka,* Assistant District Attorney, for the Commonwealth.

KATZMANN, J. Having been found guilty by a District Court jury on a charge of indecent assault and battery on a child under fourteen, in violation of G. L. c. 265, § 13B, the defendant, John R. Irwin, now appeals. The principal contentions are (1) that the Commonwealth's use of the defendant's failure to reach out to the police and his delay in speaking to them — as evidence of consciousness of guilt — was improper under the common-law rules of evidence and violated the defendant's privilege against self-incrimination, and (2) that his counsel was ineffective in failing to object to this evidence and to its use by

the prosecutor in closing argument. We reverse the conviction and remand to permit a new trial.

*Background.* On July 25, 2003, the complainant (then six years old), her brother, and her mother visited Virginia Griffin's apartment. At the apartment were Griffin (then a friend of the complainant's mother), Griffin's boyfriend Gary Closker, the couple's two sons (Brian, aged nine months, and Paul, aged three years[1]), and the defendant. The defendant had known Griffin for about fifteen years. Several years before the alleged incident, she and the defendant had a romantic relationship, and after their break-up, they remained friends.[2] The defendant also knew the complainant's mother, and had at one point rented a room from her.

On the evening of July 25, 2003, Griffin and the complainant's mother allowed the children to watch movies. At an unspecified time during the movies, the defendant, who had not been watching, left the apartment. By the time the movies ended, the children had fallen asleep on the floor. Not wanting to disturb the sleeping complainant, the complainant's mother and Griffin agreed that the complainant should spend the night. As Griffin moved the complainant to the larger bed in the apartment's sole bedroom, the complainant's mother and her son left the apartment. Griffin put Brian in a crib located in the bedroom, which directly connected to the living room. Griffin and Closker slept on the floor in the living room.[3]

Up until this point, the facts are relatively undisputed with only minor, inconsequential discrepancies. However, from this point forward, the Commonwealth and the defendant presented diverging versions of the events.

According to the Commonwealth's evidence, introduced primarily through the complainant's testimony, the next morning, the complainant woke up to find the defendant in bed with her. The defendant, who was "playing with his penis," suggested

[1]The children's names are pseudonyms.

[2]Indeed, at the time of trial, the defendant lived with Griffin and Closker (who was by then her husband) and their two children.

[3]It is not entirely clear where Paul slept. Griffin testified that he also slept on the "parlor" floor. The complainant testified that he was in the small bed in the bedroom.

that the complainant "touch [his] toy." When the defendant did not respond to the complainant's inquiry of "what is it," the complainant decided to touch it. Immediately, she realized that it was the defendant's penis,[4] got out of bed, and ran to Griffin and Closker. After learning of the incident, Griffin, according to the complainant, called the police.[5]

The complainant further testified that the defendant was the perpetrator and identified him for the jury. She explained that at the time of the incident, she recognized him from the previous evening and that she already knew him because her mother had rented him a room in their house.[6]

The Commonwealth also offered the testimony of Detective Richard Potter, who had been assigned to the case after it had been reported by the complainant's father. Detective Potter testified that he interviewed Griffin in the days following the incident. He also interviewed the defendant, who informed him that when he entered the apartment on the morning of the incident, Griffin and Closker were sleeping on the floor; that he had proceeded directly to the bedroom closet to get money from his jacket; and that thereafter his visit had devolved into an argument with Griffin. As will be further elaborated upon below, Detective Potter also testified that despite numerous attempts, he had difficulty contacting the defendant,[7] and that the defendant had missed at least one interview, including the initial

[4]The complainant testified that she knew it was the defendant's penis when she "saw the little hole in it" and because she had previously seen her little brother's penis. She further testified that the defendant's penis was bigger and "had little hairs all over it."

[5]After this point, there is an internal inconsistency in the complainant's testimony. On direct examination she testified that the defendant did not leave the bedroom until the police arrived. Conversely, on cross-examination, the complainant testified that Griffin went into the bedroom, brought the defendant out with her, and put the complainant back in the bedroom. The complainant testified that this relocation occurred before the police arrived.

The police officer who arrived at Griffin's apartment was retired at the time of trial and did not testify. There was no indication that this particular officer prepared a report or even was aware of the alleged incident involving the complainant.

[6]The complainant's mother testified on cross-examination that the complainant was familiar with the defendant from the time he lived with them.

[7]Detective Potter's primary means of contacting the defendant appears to have been through Griffin.

interview scheduled for September, 2003, and possibly avoided meeting with him for several months.

The defendant's primary witness was Griffin. At the time of the alleged incident, the defendant had keys to her apartment, and she allowed him to stay there at times, with the understanding that he would call her first before coming over. On the evening prior to the incident, the complainant visited Griffin and her family. At some point, the defendant left. Griffin testified that on the morning of the incident, she awoke when she heard and observed the defendant enter the apartment and go into the bedroom.[8] Once in the bedroom, Griffin observed the defendant reach into the closet, which was directly adjacent to the door, and take something out. The defendant then moved to the bathroom. Thereafter, Griffin and the defendant got into an argument because the defendant had not called to say that he would be coming over, and he did not have permission to enter the apartment. When the defendant would not leave, and would not return the keys to her, Griffin contacted the police, who responded and removed the defendant from the apartment.

Griffin testified that about "two hours later," while the children were watching television, the complainant informed her that "there was somebody in the bed." Upon examining the bedroom, Griffin did not observe any person in the bedroom. Upon further inquiry, the complainant told Griffin that "some strange guy was in the room" and that "he wanted [her] to touch his Charlie." When the complainant's mother arrived, Griffin did not tell her about what the complainant had said because it "didn't make sense." Nor did Griffin call the police in response to the complainant's account.

The defendant also called the complainant's father to testify. He testified that on the afternoon of the incident, he picked up

---

[8]The Commonwealth questioned Griffin's credibility on this point by focusing on the discrepancy in her testimony in comparison to her statement to Detective Potter. The discrepancy was whether Griffin was asleep when the defendant came into the apartment.

The Commonwealth also questioned Griffin's credibility by asking why she had delayed in contacting Detective Potter. Griffin explained that due to her work schedule, she and Detective Potter often had to communicate using telephone messages and that she had left him multiple messages over the course of several months.

his daughter (the complainant) and her brother at their mother's residence and took them to his home. During that visit, he had a conversation with the complainant, wherein she alleged that she had been sexually assaulted that morning at Griffin's house. Specifically, the complainant stated, "Paul's father John made me touch his Charlie."[9] After questioning his daughter further, he contacted the police. On cross-examination, the complainant's father stated that he did not know Paul, or his father. He also responded affirmatively to the prosecutor's question whether the complainant had also told him "that John took his penis out of his pants."[10]

The defendant also testified. He stated that he had dated Griffin for five years and that they had broken up but had remained friends. While he did not live in Griffin's apartment at the time of the alleged incident at issue, he was living with her, Gary Closker (by then her husband), and their two children at the time of trial. The defendant testified that he came to know the complainant's mother because she was a friend of Griffin. He had rented a room from the complainant's mother, but saw the complainant very little because of his schedule, and was not living in that rented room at the time of the alleged incident.

The defendant's testimony regarding the alleged incident was congruous with Griffin's version of the events. He testified that on July 25, 2003, he was at Griffin's apartment when the complainant's mother and her children (including the complainant) came over to watch movies. He testified that he stayed one-half hour and left, returning the next morning at 7:00 A.M. because he wanted to get some money from a pocket in his jacket, which hung in a closet in the apartment. The defendant, who testified that he had a front door key (and a key to a storage bin downstairs where he kept all his belongings), let himself in with the front door key. Griffin and Closker woke up. Griffin began arguing with him about the keys, saying that she wanted them returned. The defendant testified that he took a step into the

---

[9]As has been noted, Gary Closker is Paul's father. Detective Potter had previously testified that he "wanted to speak with Mr. Gary [Closker]; however, he [Closker] did not want to talk with me." Closker did not testify.

[10]It is not clear from the record that the complainant referred to the perpetrator solely as "John" in her statement.

bedroom and did not see anyone. He opened the closet in the bedroom, got a twenty dollar bill from a coat pocket, and went to the bathroom. When he refused to return the keys, Griffin called the police to remove him from the apartment. When the police arrived, the defendant gave Griffin the house key but retained the storage bin key. The police "asked" the defendant to leave, and he did so, later meeting Closker at a bar. The defendant testified that he did not see the complainant at all that day, and stated, "[N]o, I did not," in response to a question whether he had "touch[ed] or act[ed] inappropriately with [the complainant]."

On cross-examination of the defendant, the Commonwealth inquired why he had not attended a September, 2003, meeting with Detective Potter as he had agreed to do, instead of waiting until January, 2004.[11] The Commonwealth further inquired why there was an approximate three-month lapse in the defendant's communications with Detective Potter between September, 2003, and December, 2003.

*Discussion.* The issue in this case focuses on the Commonwealth's use of evidence relating to the defendant's prearrest inaction and silence to suggest consciousness of guilt. The Commonwealth's theory was that the defendant's failure to reach out to the police or to speak with them at the first opportunity, and his declining to comply with police requests for an interview, were evidence of guilt.[12] Our analysis is informed by two related principles, one founded in the common-law rules of evidence, and the other in the Constitution of the Commonwealth.

First, regarding the common-law evidentiary rule, as the Supreme Judicial Court has observed, while "[t]he Supreme Court of the United States has held that a defendant's pre-arrest silence may be used to impeach him without denying fundamen-

---

[11]In addition to attempting to show consciousness of guilt, the Commonwealth also impeached the defendant's credibility by showing that he had previously been found guilty of witness intimidation and malicious destruction of property.

[12]While the defendant did speak with the police in January, 2004, after being given Miranda warnings, nothing in the record indicates that he or the police discussed the reason for the delay between September, 2003, and the January, 2004, interview. Thus, we do not deal here with the propriety of prosecutorial comment on the explanation for delay a defendant himself gives to police after a knowing waiver of his Miranda rights.

tal fairness guaranteed by the Fourteenth Amendment [to the United States Constitution,] *Jenkins* v. *Anderson*, 447 U.S. 231, 239 (1980)[, t]he Supreme Court has left it to the States to determine under their own rules of evidence when pre-arrest silence is so inconsistent with a defendant's testimony that impeachment by reference to that silence is probative." *Commonwealth* v. *Nickerson*, 386 Mass. 54, 59 (1982). Based on the common-law rules of evidence, the Supreme Judicial Court has noted that "impeachment of a defendant with the fact of his prearrest silence should be approached with caution," *Commonwealth* v. *Thompson*, 431 Mass. 108, 117, cert. denied, 531 U.S. 864 (2000), quoting from *Commonwealth* v. *Nickerson*, *supra* at 62, and that such evidence is of "extremely limited probative worth." *Commonwealth* v. *Nickerson*, *supra* at 61 n.6, quoting from *People* v. *Conyers*, 52 N.Y.2d 454, 458 (1981). Whenever such impeachment "is undertaken, it should be prefaced by a proper demonstration that it was 'natural' to expect the defendant to speak in the circumstances." *Commonwealth* v. *Nickerson*, *supra* at 62. See *Commonwealth* v. *Gonzalez*, 68 Mass. App. Ct. 620, 631 (2007). "To permit the use of his prearrest silence, if only for impeachment purposes, suggests that the defendant had a duty to provide incriminating evidence against himself and burdens his right to testify in his own defense. . . . Although most lay people do not know the intricacies of their constitutional rights, it is a generally held notion that one does not have to say anything to the police and that what one does say may be used against him." *Commonwealth* v. *Nickerson*, *supra* at 61. Indeed, there are a number of reasons why a potential defendant may decide not to reach out to or otherwise interact with law enforcement. Thus,

> "an individual's failure to speak may be the result of his awareness that he has no obligation to speak, his caution arising from knowledge that anything he says may be used against him, and his belief that efforts to exonerate himself would be futile. . . . [S]ome individuals would not come forward because they want to avoid contact with the police. Although prearrest silence may reflect negatively on a defendant's trial testimony, that silence may be entirely unrelated to the truth or falsity of his testimony.

"Balanced against the likely low potential of evidence of a defendant's pre-arrest silence for advancing the truth-finding process is the risk of substantial prejudice to the defendant of an attempt to impeach him because of his failure to come forward with an exculpatory version of the events. This potential prejudice is substantial even if the defendant's pre-arrest silence is used not to prove his guilt but only for the purpose of impeachment. 'Jurors, who are not necessarily sensitive to the wide variety of alternative explanations for a defendant's pretrial silence, may be prone to construe such silence as an admission and, as a consequence, may draw an unwarranted inference of guilt. Because evidence of a defendant's pretrial silence may have a disproportionate impact upon the minds of the jurors and because the potential for prejudice inherent in such evidence outweigh[s] its marginal probative worth, we conclude that the use of such evidence for impeachment purposes cannot be justified in the absence of unusual circumstances.' *People* v. *Conyers, supra* at 459."

*Commonwealth* v. *Nickerson, supra* at 61 n.6. See *Commonwealth* v. *Stuckich,* 450 Mass. 449, 453 (2008) ("That the defendant said that he would call [the detective] back or have his attorney do so, and that [the detective] never heard again from anyone, is not a sufficient evidentiary foundation to support [a consciousness of guilt] instruction").[13]

The second principle governing our analysis is rooted in the constitutional privilege against self-incrimination.

"Article 12 of the Massachusetts Declaration of Rights provides that no person shall be compelled to accuse or furnish evidence against himself. Pursuant to this mandate, testimonial evidence of a defendant's refusal to comply with a police request may not be admitted against him.

---

[13]The cases cited by the Commonwealth in support of the contention that evidence of delay in cooperation was properly admitted as consciousness of guilt, are inapposite or distinguishable. For example, in *Commonwealth* v. *Connors,* 345 Mass. 102, 105-106 (1962), which preceded by twenty years *Commonwealth* v. *Nickerson, supra,* the point does not appear to have been contested. In *Commonwealth* v. *Garuti,* 23 Mass. App. Ct. 561, 567-568 (1987), the delay evidence came in apparently without objection during the cross-examination of the defendant, and the propriety of this admission was not contested on appeal.

See *Commonwealth* v. *Conkey*, 430 Mass. 139, 141, 143 (1999) (error to admit evidence that defendant refused to submit to fingerprint test); *Commonwealth* v. *Hinckley*, 422 Mass. 261, 264 (1996) (refusal to turn over sneakers); *Commonwealth* v. *McGrail*, 419 Mass. 774, 779-780 (1995) (refusal to take field sobriety test); *Commonwealth* v. *Lydon*, 413 Mass. 309, 314-315 (1992) (refusal to submit to hand swabbing for evidence of gunpowder residue)."

*Commonwealth* v. *O'Laughlin*, 446 Mass. 188, 205 (2006). In short, while evidence warranting an inference of consciousness of guilt is admissible in certain contexts, "evidence of a defendant's refusal to comply with a police request" is inadmissible "because in so refusing a defendant furnishes evidence against himself, and admission of that evidence would violate art. 12." *Commonwealth* v. *Conkey*, *supra* at 141. See *Commonwealth* v. *Hinckley*, *supra* at 264. See also *Commonwealth* v. *Delaney*, 442 Mass. 604, 611 (2004).

Here, the jury could have made an inference as to the defendant's consciousness of guilt when, during the Commonwealth's case-in-chief, Detective Potter testified that the defendant had initially agreed to meet with the detective in September, 2003, but then failed to arrive for the interview. This inference was reinforced when Detective Potter further testified that despite numerous attempts to contact the defendant (primarily by asking Griffin to have the defendant call the detective), he did not speak with the defendant again for some three months and that the interview was not held until January, 2004. From the missed interview and the alleged pattern of avoidance over a period of several months, the jury may have inferred that the defendant was avoiding Detective Potter because he was guilty. See *Commonwealth* v. *Conkey*, *supra* at 142 ("Conduct evidence admitted to show consciousness of guilt is always testimonial because it tends to demonstrate that the defendant knew he was guilty").

Later, during Griffin's cross-examination, the prosecutor built upon the defendant's failure to participate in the September, 2003, interview. This was accomplished by obtaining Griffin's affirmative acknowledgment that Detective Potter had called her prior to the scheduled interview, that he had informed her of the allegations against the defendant, and that she had relayed those

accusations to the defendant. Griffin also indicated that sub-sequently the detective had called her several times in an effort to get in touch with the defendant. By this line of cross-exami-nation, the jurors may have recalled Detective Potter's earlier testimony suggesting the defendant's consciousness of guilt in missing the September, 2003, interview.[14]

Then, during the cross-examination of the defendant, the prosecutor, venturing into a prohibited area as to which the defen-dant's testimony had not opened the door, addressed multiple questions to the defendant regarding his contacts with Detective Potter. The following sequence, occurring after the prosecutor got the defendant to concede that he had learned of the allega-tions during his initial conversation with Detective Potter, arose amongst these questions:

> *Q.:* "Now, after you heard that you must have been alarmed. Right?"
>
> *A.:* "Yeah."
>
> *Q.:* "You must have been frightened?"
>
> *A.:* "Alarmed."
>
> *Q.:* "One would think you must have wanted to speak with that detective right away?"
>
> DEFENSE COUNSEL: "Objection."
>
> *Q.:* "Right?"
>
> *A.:* "Yeah."
>
> THE COURT: "Overruled."
>
> ". . ."

---

[14]In short, the prosecutor built upon the earlier impermissible inference as to the defendant's consciousness of guilt in order to impeach Griffin's cred-ibility, as the cross-examination essentially suggested that Griffin was com-plicit in the defendant's alleged pattern of avoiding Detective Potter's at-tempts to contact him. While the prosecutor could have permissibly shown that Griffin was in some way biased, this line of cross-examination should have been avoided. Given that the Commonwealth had already shown that Griffin had previously had a romantic relationship with the defendant, that they have a continuing friendship, and that the defendant was living with Grif-fin and her family at the time of trial, the further evidence of bias was cumulative and likely more prejudicial than probative.

*Q.:* "One would think that you must have wanted to speak with the detective right away. Yes?"

*A.:* "Yes."

*Q.:* "And the detective you did meet with him in January. Right?"

*A.:* "I don't recall when I met with him, but I met with him."

*Q.:* "And it's fair to say that January comes three months after September. Right?"

*A.:* "Yeah."

These questions quite clearly suggested that if the defendant were innocent, he would have met with the police and cooperated with them without delay. Moreover, in focusing on the defendant's continuing refusal to participate in an interview with Detective Potter, the colloquy served to impermissibly suggest to the jury that the defendant was avoiding interaction with Detective Potter because he was in fact guilty.[15]

Last, during her closing argument, the prosecutor stated,

"We know from the detective that he told [the defendant the allegations], and we know that he set up a meeting. They were supposed to meet.

"Now, I even asked this defendant if someone — a [inaudible] that if someone accused you of a sexual act on a six-year-old child, wouldn't you want to do something

---

[15]The defendant in this case did voluntarily take the stand, thereby waiving "his privilege against self-incrimination to the extent that he render[ed] himself liable to cross-examination on all facts relevant and material to the crime with which he [was] charged." *Commonwealth* v. *Johnson*, 46 Mass. App. Ct. 398, 406 (1999), quoting from *Commonwealth* v. *Seymour*, 39 Mass. App. Ct. 672, 675 (1996). However, as we explained in *Commonwealth* v. *Johnson*, *supra*, inquiry as to a refusal to participate is only permissible on cross-examination when the defendant, during his own direct examination, opens the door to such an inquiry. See *id.* at 405-406 (defendant testified that he did not disguise his voice during an identification procedure; Commonwealth permitted to introduce evidence on cross-examination that the defendant had twice been subpoenaed to participate and in both instances refused, thereby showing that the delay stemming from this refusal contributed to a witness's failure to identify the defendant during the subsequent voice lineup). The defendant in this case did not open this door.

about it right away, and he said yes. But months went by and months. More months, and in January when the detective was finally able to meet with him. Does that make any sense at all?

"Now, Detective Potter told you that he has voicemail, and he received messages. And the defendant and his friend would actually have you believe that this detective . . . didn't return messages? . . . Is that what makes sense?"

In sum, the closing argument ran afoul of the strictures emanating from the confluence of the common-law evidentiary rule and the privilege against self-incrimination. In so doing, the prosecutor again impermissibly suggested that this evidence established the defendant's consciousness of guilt. There was no basis for doing so.

As defense counsel did not object to any of these separate lines of inquiry, we review to determine whether these references, taken together, amounted to a substantial risk of a miscarriage of justice. *Commonwealth* v. *Alphas*, 430 Mass. 8, 17 (1999). See Smith, Criminal Practice & Procedure § 33.6 (3d ed. 2007). We conclude that they do.

Here, as in most such cases, there was no corroborating evidence or eyewitness testimony (besides that of the victim) to the alleged act. The case turned largely on the credibility of the defendant and the complainant. Although the complainant (who was six years old at the time of the alleged incident) testified that the defendant was the perpetrator and that she knew who the defendant was at the time of the incident, in her original complaint to her father, the complainant had stated that the perpetrator was "Paul's father John."[16] The jury were aware that Paul's father's name was Gary, and that Gary was also present in the apartment at the time of the alleged incident. This statement thus lent some credence to the defendant's theory that he was not the man the complainant found in bed with her. Moreover, the jury heard from both Griffin and the defendant that the defendant had

---

[16]Defense counsel argues that the complainant also referred to the perpetrator as "Paul's daddy" or "my cousin's daddy" in interviews with the Department of Children and Families and in the initial police reports. However, these statements are not included in the present record.

entered the apartment, taken one step into the bedroom, retrieved something from the closet, and then left the bedroom. He was then removed from the apartment by the police. Under this version of events, the defendant did not have the opportunity to be in the bed with the complainant.

Certainly, the jury were free to find the defense's version of events implausible. In these circumstances, however, given that the prosecutor emphasized the defendant's failure to participate in the September, 2003, interview and his continuing failure to contact Detective Potter, and given the suggestion and argument that an innocent person would not delay in speaking with law enforcement, we cannot be confident that use of the consciousness of guilt evidence did not impermissibly sway the jury's determination as to the defendant's credibility and therefore his culpability. In sum, "we have a serious doubt whether the result of the trial might have been different had the error[s] not been made." *Commonwealth* v. *LeFave*, 430 Mass. 169, 174 (1999). Thus, a substantial risk of a miscarriage of justice was created, and a new trial is necessary. See *ibid.* See also *Commonwealth* v. *Martinez*, 34 Mass. App. Ct. 131, 133 (1993) ("case turned on the credibility of the parties" and there was a "paucity of physical evidence").

The Commonwealth's assertions to the contrary are unpersuasive. That the defendant ultimately contacted the detective does not mean that the "refusal cases" are inapposite or diminish their applicability here; the fact remains that the Commonwealth introduced instances of noncompliance and forcefully called it to the jury's attention. See *Commonwealth* v. *Conkey*, 430 Mass. at 143. Nor was this evidence justified on some theory that the defendant created confusion that required a clarifying response by the Commonwealth. The defendant never created an issue of the timing of the interview that required a response by the Commonwealth. Compare *Commonwealth* v. *O'Laughlin*, 446 Mass. at 205-206 (refusal evidence permissible because otherwise "would result in jury speculating as to how the police permitted a potentially important piece of evidence to disappear. Such an editing of events destroys the thrust of the evidence and transforms it from testimony that inculpates the defendant to evidence that leaves the police subject to a charge that they investigated in a careless manner"). Similarly, the mechanics by which Detec-

tive Potter contacted the defendant had no bearing on the defendant's theory of the case. The prosecutor had no basis for introducing the evidence and argument now before us, except in furtherance of the impermissible theory that they showed consciousness of guilt. See *id.* at 206.[17]

Finally, we observe that the history of the litigation strategies pursued in this case reflects that the Commonwealth recognized the potential impact of the evidence at issue, particularly when deployed during closing argument. The trial giving rise to the conviction here was preceded by a trial resulting in a hung jury. In the first trial (which ended two days before the second one), the questioning and evidence regarding the defendant's inaction, delay, and noncompliance were not developed as sharply. Perhaps more significantly, the prosecutor's closing argument there made no mention of this evidence, nor was it a theme of the closing. Here by contrast, toward the very end of a one-day trial, the jury heard a forceful, flawed closing argument by the same prosecutor drawing attention to the impermissible evidence. In any event, for the reasons noted above, "we cannot say with fair assurance that the [errors] did not substantially sway the outcome of the case." *Commonwealth* v. *Spencer*, 49 Mass. App. Ct. 383, 391 (2000) (quotations and citations omitted). See *Commonwealth* v. *Broomhead*, 67 Mass. App. Ct. 547, 554-555 (2006) (substantial risk of a miscarriage of justice where the prosecutor erroneously commented on missing witnesses in the trial yielding a conviction, especially where in two previous trials resulting in hung juries, the prosecutor had not committed this error).

Accordingly, the judgment is reversed, the verdict is set aside, and the case is remanded to permit a new trial.

*So ordered.*

---

[17]In light of our disposition, we need not address the defendant's ineffective assistance of counsel claims. Moreover, given that a new trial is required, we need not address the defendant's claim that the judge abused his discretion in denying the defendant's *Bishop-Fuller* motion seeking the complainant's counselling records. See *Commonwealth* v. *Bishop*, 416 Mass. 169 (1993); *Commonwealth* v. *Fuller*, 423 Mass. 216 (1996). On retrial, such a motion will be governed by the new protocol set forth in *Commonwealth* v. *Dwyer*, 448 Mass. 122, 145-147 (2006).