## JOHN R. IRWIN vs. COMMONWEALTH.

Suffolk. March 7, 2013. - July 15, 2013.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Governmental Immunity. Commonwealth,* Claim against. *Practice, Civil,* Proceeding against Commonwealth, Interlocutory appeal. *Erroneous Conviction.*

The Commonwealth may pursue an interlocutory appeal, under the doctrine of present execution, of the determination that a plaintiff is an eligible claimant as defined under the erroneous convictions statute, G. L. c. 258D, given that the statute provides only a limited waiver of the Commonwealth's sovereign immunity to a certain class of claimants, and the threshold matter of eligibility as a member of that class is a collateral issue, separate and distinct from the merits of the claim for relief that a claimant must establish at trial. [840-842]

This court concluded that a conviction that was overturned because the Commonwealth improperly introduced evidence of the plaintiff's prearrest silence as purportedly establishing consciousness of guilt was not overturned "on grounds which tend to establish" his innocence, where, in the circumstances, the evidence was neither probative nor relevant to establish any fact at trial; therefore, the defendant was not eligible to pursue a claim for compensation for an erroneous felony conviction pursuant to G. L. c. 258D, § 1 (B) (ii). [842-855]

CIVIL ACTION commenced in the Superior Court Department on March 14, 2011.

Motions to dismiss and for partial judgment on the pleadings were heard by *Raymond J. Brassard,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*David Hartnagel,* Assistant Attorney General, for the Commonwealth.

*Robert S. Sinsheimer (David Scott* with him) for the plaintiff.

*Alex G. Philipson,* pro se, amicus curiae, submitted a brief.

LENK, J. In this case we consider whether the Commonwealth may pursue an interlocutory appeal, under the doctrine of present

execution, of the determination that a plaintiff is an eligible claimant as defined under the erroneous convictions statute, G. L. c. 258D.[1] We consider also whether a conviction that was overturned because the Commonwealth introduced evidence of the plaintiff's prearrest silence as purportedly establishing consciousness of guilt was overturned "on grounds which tend to establish" his innocence, such that he is eligible to pursue his claim for compensation for an erroneous felony conviction pursuant to G. L. c. 258D, § 1 (B) (ii).

Because the erroneous convictions statute provides only a limited waiver of the Commonwealth's sovereign immunity, we conclude that the doctrine of present execution applies to claims brought under that statute, and thus that interlocutory appeal is appropriate. While we conclude that "grounds which tend to establish" an individual's innocence are not necessarily limited to the exclusion of exculpatory evidence at trial, we nonetheless conclude also that the plaintiff, John R. Irwin, is not eligible to pursue his compensation claim, because the grounds on which his conviction was reversed were not "probative of the proposition that [he] did not commit the crime." *Guzman* v. *Commonwealth*, 458 Mass. 354, 362 (2010) (*Guzman*), quoting *Guzman* v. *Commonwealth*, 74 Mass. App. Ct. 466, 477 (2009).

*Background and prior proceedings.* We summarize the facts based on the detailed discussion in the Appeals Court's decision, see *Commonwealth* v. *Irwin*, 72 Mass. App. Ct. 643 (2008) (*Irwin*),[2] reserving some facts for later discussion. The incident resulting in the overturned conviction occurred on July 26, 2003, at the home of Virginia Griffin.[3] The complainant, the daughter of a friend of Griffin, was six years old at the time of the alleged offense. On the evening of July 25, the complainant, her mother, and her brother were visiting Griffin, Griffin's then

---

[1]We acknowledge the amicus brief of Alex G. Philipson.

[2]The Appeals Court's decision relied on testimony at Irwin's two trials. The events on the evening of July 25, 2003, were not contested at trial. The focus of both trials was the events on the morning of July 26.

[3]In July, 2003, Virginia Griffin had known Irwin for about fifteen years and had dated him a number of years earlier; the two had remained friends after they ended their romantic relationship at some point seven to ten years previously.

live-in boyfriend, Gary Closker,[4] and Griffin's two sons, nine month old Brian and three year old Paul,[5] as was Irwin. The children were lying on the living room floor watching movies. Irwin left the apartment at some point during the movies.

When the movies ended, the complainant had fallen asleep on the living room floor. In order not to wake her, the complainant's mother and Griffin agreed that the complainant would spend the night at Griffin's apartment, and the complainant's mother would pick her up the next morning. Her mother and her brother then left. Griffin moved the complainant to the large bed in the apartment's single bedroom,[6] and put Brian in the crib in that room.[7] Griffin and Closker then went to sleep on the living room floor.

The complainant testified on direct examination that she woke up the next morning and found Irwin in the bed with her. He was "playing with his penis" and asked her to touch his "toy." She did so, at first not knowing what it was. When she realized what it was, because she had seen her younger brother's, she ran into the living room, woke up Griffin and Closker, and told Griffin what had happened. The child testified that Griffin telephoned the police because Irwin would not get out of the bed and that, when police arrived, Irwin left the bedroom.[8]

Griffin testified[9] that she woke up on the morning of July 26, when Irwin entered the apartment[10] and went into the bedroom. She saw him take something from the bedroom closet, which

[4]By the time of trial, Griffin had married Gary Closker, and Irwin was living with them and Griffin's children.

[5]We refer to the children by the pseudonyms used by the Appeals Court.

[6]The apartment was small and contained one bedroom. The bedroom, bathroom, and kitchen opened directly into the living room. The bedroom closet door was immediately adjacent to the door into the bedroom.

[7]The bedroom contained a large bed, a child's bed, and a crib. There was conflicting testimony at trial regarding whether Griffin's older son slept in the child's bed in the bedroom or on the living room floor on the night of July 25 to 26, 2003.

[8]On cross-examination, the complainant testified that Griffin removed Irwin from the bedroom, and returned the complainant to the bedroom, before police arrived.

[9]Griffin testified as a defense witness.

[10]At the time of the incident, Irwin was homeless and did not have a telephone. He had a key to Griffin's apartment, occasionally slept there, and stored some of his belongings in a storage locker in the apartment building.

was next to the door into the bedroom, and then go into the bathroom. When Irwin came out of the bathroom, he and Griffin began arguing because he had not telephoned in advance and she had not given him permission to be there.[11] When Irwin refused to leave or to return the key to the apartment, she telephoned police. Police arrived and removed Irwin from the premises.[12]

Several hours later, while the complainant was watching television, she told Griffin that there was a "strange guy" in the bed who wanted the complainant to "touch his Charlie," but Griffin saw no one in the bedroom. Griffin thought that the statement did not "make sense" and took no further action. The complainant's father contacted police later that afternoon, when the child told him what had happened at Griffin's house.

Irwin testified on his own behalf. He said that he had come to the apartment at approximately 7 A.M., after having been up all night, to get some money from his coat hanging in the closet there. He reached into the coat pocket and removed a twenty dollar bill while standing within a step of the bedroom door; he did not see the complainant or anyone else in the room, and did not see the complainant at any time that day. He and Griffin got into an argument when he refused to return the key to the apartment, and Griffin telephoned police. He returned the apartment key when police arrived, but kept the key to the storage bin. Later that day, he met Closker at a bar.

Detective Richard Potter, the officer assigned to the investigation after the complainant's father's report, testified concerning his interviews of Griffin in the days following the incident, and his interview of Irwin in January, 2004.[13] Potter testified further, without objection, that he had made numerous unsuccessful efforts to contact Irwin, through Griffin; that Irwin had failed to attend an interview scheduled for September, 2003, after Irwin

---

[11]Irwin and Griffin had arranged that Irwin was to come over to the apartment to sleep and was to use the key only after obtaining Griffin's prior agreement.

[12]By the time of trial, in October, 2005, the officer who responded to Griffin's July 26 telephone call had retired and did not testify. His police report does not contain any mention of the complainant's statements.

[13]The statements Detective Richard Potter described them as making were consistent with Griffin's and Irwin's trial testimony.

and Potter had spoken by telephone; and that Irwin may have avoided contacting him for several months thereafter. In December, 2003, Potter was again able to reach Irwin, who met with police in January, 2004. There was no evidence that Irwin offered a reason for the three-month delay. On cross-examination, without objection, Griffin testified that she had informed Irwin of Potter's efforts to reach him and of the reasons for Potter's investigation. She testified further that Irwin had no telephone number and that she had informed Potter he could try to reach Irwin through his mother.

Irwin's first trial, on October 18, 2005, ended in a mistrial when the jury were unable to reach a verdict. His second trial began on October 20. At this trial, the prosecutor emphasized in direct examination and cross-examination, again without objection, Irwin's delay in responding to police requests to speak to him and his failure to attend the scheduled interview in September, 2003; she argued in closing that an innocent person accused of such a crime would have wanted to come forward and speak to police right away. On October 21, Irwin was convicted of indecent assault and battery on a child under fourteen. He was sentenced to two and one-half years' incarceration, with fifteen months committed. Ultimately, due to parole violations, he served approximately twenty-seven months. On September 15, 2008, the Appeals Court vacated Irwin's conviction and granted him a new trial on the grounds that the use of Irwin's prearrest silence as evidence of consciousness of guilt was improper both under common-law evidentiary rules and as constitutionally impermissible comment on his privilege against self-incrimination. In August, 2009, the Commonwealth filed a nolle prosequi.

In March, 2011, Irwin filed a complaint in the Superior Court pursuant to G. L. c. 258D, seeking compensation for an erroneous felony conviction. The Commonwealth moved to dismiss the complaint, arguing that Irwin was not among the class of claimants eligible to pursue a claim for relief under the erroneous convictions statute. Concluding that Irwin is eligible to pursue his claim for compensation under that statute, a Superior Court judge denied the Commonwealth's motion to dismiss the complaint and for partial judgment on the pleadings, and allowed Irwin's cross motion for partial judgment on the plead-

ings. The Commonwealth filed an interlocutory appeal in the Appeals Court, and we transferred the case to this court on our own motion.

*Discussion.* An individual who has been convicted by the Commonwealth of a felony resulting in incarceration,[14] whose conviction has been vacated or reversed by a court of the Commonwealth, may seek compensation from the Commonwealth, where the indictment or complaint has been dismissed, a nolle prosequi has been entered, or the individual was found not guilty at a new trial, if the judicial relief was granted "on grounds which tend to establish the innocence of the individual." G. L. c. 258D, § 1 (B).[15]

Once an individual has established that he or she is within the class of persons eligible to pursue a compensation claim, in order to prevail and recover damages at trial, he must prove, by clear and convincing evidence, inter alia, that he did not commit the charged offense.[16] G. L. c. 258D, § 1 (C).

---

[14]"A claim may be brought against the commonwealth for an erroneous felony conviction resulting in incarceration as provided in this chapter." G. L. c. 258D, § 1 (A).

[15]General Laws c. 258D, § 1 (B), provides:

> "The class of persons eligible to obtain relief under this chapter shall be limited to the following:—

> "(i) those that have been granted a full pardon pursuant to section 152 of chapter 127, if the governor expressly states in writing his belief in the individual's innocence, or

> "(ii) those who have been granted judicial relief by a state court of competent jurisdiction, on grounds which tend to establish the innocence of the individual as set forth in clause (vi) of subsection (C), and if (a) the judicial relief vacates or reverses the judgment of a felony conviction, and the felony indictment or complaint used to charge the individual with such felony has been dismissed, or if a new trial was ordered, the individual was not retried and the felony indictment or complaint was dismissed or a nolle prosequi was entered, or if a new trial was ordered the individual was found not guilty at the new trial; and (b) at the time of the filing of an action under this chapter no criminal proceeding is pending or can be brought against the individual by a district attorney or the attorney general for any act associated with such felony conviction."

[16]Pursuant to G. L. c. 258D, § 1 (C),

> "In order for an individual to prevail and recover damages against

1. *Doctrine of present execution.* As an initial matter, we consider whether the Commonwealth is entitled to pursue an interlocutory appeal of the denial of a motion to dismiss a G. L. c. 258D claim under the doctrine of present execution.[17]

Ordinarily, the Commonwealth is immune from suit unless it waives its right to sovereign immunity and consents to being sued. See, e.g., *Brum* v. *Dartmouth*, 428 Mass. 684, 688 (1999). Where the Commonwealth does choose to waive its sovereign

the commonwealth in a cause of action brought under [G. L. c. 258D], the individual must establish, by clear and convincing evidence, that:—

"(i) he is a member of the class of persons defined in [G. L. c. 258D, § 1 (B)];

"(ii) he was convicted of an offense classified as a felony;

"(iii) he did not plead guilty to the offense charged, or to any lesser included offense . . .

"(iv) he was sentenced to incarceration for not less than 1 year . . . and has served all or any part of such sentence;

"(v) he was incarcerated solely on the basis of the conviction for the offense that is the subject of the claim;

"(vi) he did not commit the crimes or crime charged in the indictment or complaint . . . ; and

"(vii) to the extent that he is guilty of conduct that would have justified a conviction of any lesser included misdemeanor . . . he has served the maximum sentence he would have received for such lesser included misdemeanor and not less than one additional year in a prison."

[17]Although the Commonwealth did not raise this issue in the Superior Court, as the issue is one of subject matter jurisdiction, it may be considered for the first time on appeal. See *Maxwell* v. *AIG Domestic Claims, Inc.*, 460 Mass. 91, 99-100 (2011), and cases cited; *Vining* v. *Commonwealth*, 63 Mass. App. Ct. 690, 696 (2005). This question was left open in *Drumgold* v. *Commonwealth*, 458 Mass. 367, 368 n.2 (2010) (*Drumgold*), where we considered the Commonwealth's appeal from the denial of a motion for summary judgment on a G. L. c. 258D claim, which the Commonwealth had filed as an interlocutory appeal purportedly under the doctrine of present execution, stating explicitly that we were not deciding whether the doctrine of present execution was applicable to such a claim.

The parties did not discuss the question in their briefs to the Appeals Court. After this court's request for amicus briefs on the question whether the doctrine of present execution was applicable in these circumstances, however, the Commonwealth filed a supplemental brief addressing the issue.

immunity, it can be sued "only in the manner and to the extent expressed [by the] statute." *Boxford* v. *Massachusetts Highway Dep't*, 458 Mass. 596, 601 (2010), quoting *DeRoche* v. *Massachusetts Comm'n Against Discrimination*, 447 Mass. 1, 12 (2006). In short, sovereign immunity protects the Commonwealth from the burden of having to go to trial, unless the Commonwealth consents to do so. See *McArthur Bros. Co.* v. *Commonwealth*, 197 Mass. 137, 138 (1908).

An interlocutory order may be appealed under the doctrine of present execution "if the order will interfere with rights in a way that cannot be remedied on appeal from a final judgment." *Commonwealth* v. *Al Saud*, 459 Mass. 221, 227 n.15 (2011), quoting *Benoit* v. *Frederickson*, 454 Mass. 148, 151-152 (2009). The doctrine of present execution thus affords the Commonwealth the right to an immediate appeal where the Commonwealth maintains that it is immune from suit, and that to require it to litigate the issue of waiver of sovereign immunity at trial would vitiate such immunity, imposing on it the burden of proceeding to trial from which the doctrine of sovereign immunity affords it protection. See *Brum* v. *Dartmouth, supra,* citing *Matthews* v. *Rakiey*, 38 Mass. App. Ct. 490, 493 (1995) (right to immunity from suit "would be 'lost forever' if an order denying it were not appealable until the close of litigation").

The doctrine of present execution requires that the immunity defense be collateral to the rest of the controversy. *Mitchell* v. *Forsyth*, 472 U.S. 511, 527-529 (1985). See *Maxwell* v. *AIG Domestic Claims, Inc.*, 460 Mass. 91, 106 n.12 (2011), citing *Elles* v. *Zoning Bd. of Appeals of Quincy*, 450 Mass. 671, 673-674 (2008) (present execution permits appeal only from questions that are "collateral" to merits of controversy). The doctrine does not apply to questions concerning a determination of actual liability. See *Brum* v. *Dartmouth, supra,* and cases cited. "[T]he denial of a motion to dismiss on immunity grounds is always collateral to the rights asserted in the underlying action because it 'is conceptually distinct from the merits of the plaintiff's claim that his rights have been violated.' " *Kent* v. *Commonwealth*, 437 Mass. 312, 317 (2002), quoting *Mitchell* v. *Forsyth, supra.* See *Boxford* v. *Massachusetts Highway Dep't, supra.*

The erroneous convictions statute, which provides "Compen-

sation for Certain Erroneous Felony Convictions," waives sovereign immunity "for an erroneous felony conviction," G. L. c. 258D, § 1 (A), then establishes the class of claimants "eligible to obtain relief." G. L. c. 258D, § 1 (B). While, unlike the exceptions to the waiver of sovereign immunity set forth in the Massachusetts Tort Claims Act, see G. L. c. 258, § 10 (waiver in G. L. c. 258, § 2, "shall not apply," inter alia, when employee fails to exercise discretionary function or commits intentional tort), the waiver of sovereign immunity in the erroneous convictions statute is not limited explicitly by the statutory language, it is nonetheless clearly limited only to those individuals who can establish their membership in a particular class.

General Laws c. 258D, § 1 (B) and (C), define the requirements for establishing that the conviction was erroneous. General Laws c. 258D, § 1 (C), sets forth the elements a claimant must prove, by clear and convincing evidence, in order to prevail and obtain compensation under the statute. The first of those elements is that a claimant must establish that "he is a member of the class of persons defined in [G. L. c. 258D, § 1 (B)]." G. L. c. 258D, § 1 (C) (i). Thus, the Commonwealth has granted a limited waiver of its sovereign immunity under the erroneous convictions statute to that class of claimants who establish that they are eligible for relief. The threshold matter of eligibility as a member of the class of claimants eligible to pursue relief is a "collateral" issue, separate and distinct from the merits of the claim for relief that a claimant must establish at trial. We conclude, therefore, that the Commonwealth may pursue its interlocutory appeal under the doctrine of present execution.

2. *Eligibility for relief.* We turn to the merits of the Commonwealth's claim that Irwin is not an eligible claimant under the erroneous convictions statute because his conviction was overturned on grounds that do not "tend to establish [his] innocence." In reversing Irwin's conviction, the Appeals Court held that the Commonwealth "had no basis for introducing" the evidence concerning Irwin's prearrest silence other than "in furtherance of the impermissible theory that [it] showed consciousness of guilt."[18] *Irwin, supra* at 656. The Commonwealth characterizes the basis for the Appeals Court's

---

[18] In *Guzman v. Commonwealth*, 458 Mass. 354, 362 (2010) (*Guzman*), and

reversal as the improper admission of "inculpatory evidence" of consciousness of guilt that would be admissible, pursuant to G. L. c. 258D, § 1 (F),[19] at any trial for compensation under the erroneous convictions statute. The Commonwealth maintains that only those whose convictions are overturned based on the omission of exculpatory evidence are eligible claimants under the erroneous convictions statute, and that individuals such as Irwin, whose convictions are reversed because the Commonwealth introduced "excessive evidence" of their guilt, are not among the class of eligible claimants to whom the Legislature intended to provide compensation.

Since the erroneous convictions statute was enacted in 2004, we have had few opportunities to construe the extent of its requirement that, to be eligible for relief, a claimant's conviction must have been overturned on "grounds which tend to establish the innocence" of the plaintiff. G. L. c. 258D, § 1 (B) (ii). We have interpreted the word "grounds" in that statute as meaning "basis." See *Guzman, supra* at 361-362, citing Webster's Third New International Dictionary 1002 (1993) ("the foundation or basis on which knowledge, belief, or conviction rests"), and

*Drumgold, supra* at 370, both appeals from decisions on the Commonwealth's motions for summary judgment, we employed, without discussion, essentially a de novo standard of review, citing Mass. R. Civ. P. 56 (c), as amended, 436 Mass. 1404 (2002). See *Drumgold, supra* at 370; *id.* at 381 (Cowin, J., dissenting). Because this case, too, involves a denial of the Commonwealth's motion for summary judgment, we apply the same standard here.

[19]In reference to the evidence admissible at a trial for compensation under the erroneous convictions statute, G. L. c. 258D, § 1 (F), provides:

> "In the interest of doing substantial justice, with regard to weight and admissibility of evidence submitted by the claimant or the commonwealth, the court presiding at a jury-waived trial shall exercise its discretion by giving due consideration to any difficulties of proof caused by the passage of time, the death or unavailability [of] witnesses, or other factors not caused by the claimant, or those acting on the claimant's or the commonwealth's behalf. At a jury trial, the court shall consider these same factors as part of the exercise of its discretion when determining the admissibility and weight of evidence, and the court shall instruct the jury that it may consider the same factors when it weighs the evidence presented at trial. No evidence proffered by any party shall be excluded on grounds that it was seized or obtained in violation of the Fourth, Fifth or Sixth amendments to the Constitution of the United States, or in violation of Articles 12 or 14 of Part the First of the Constitution of Massachusetts."

Black's Law Dictionary 772 (9th ed. 2009) ("[t]he reason or point that something [as a legal claim or argument] relies on for validity"). Thus, the requirement that judicial relief must have been granted on "grounds which tend to establish the innocence" of a claimant does not limit the threshold question of eligibility for relief "to individuals whose convictions were vacated or reversed strictly on the basis 'of compelling or overwhelming exculpatory evidence,' that is, on the grounds that they were actually innocent." *Guzman, supra* at 359, quoting *Guzman* v. *Commonwealth*, 74 Mass. App. Ct. 466, 477 (2009). Rather, "grounds which tend to establish" a plaintiff's innocence require that a conviction be overturned "on grounds resting upon facts and circumstances probative of the proposition that the claimant did not commit the crime." *Guzman, supra*, quoting *Guzman* v. *Commonwealth*, 74 Mass. App. Ct. at 477. We have cautioned, however, that such grounds must "tend[] to do more than merely assist the defendant's chances of acquittal." *Guzman, supra* at 360.

In both instances where we have decided that a plaintiff was eligible to pursue his claim for compensation, and underlying the Commonwealth's argument here that only the omission of such evidence establishes grounds for relief, the plaintiffs' convictions were overturned based on the omission of exculpatory evidence at trial.

In *Guzman, supra* at 359-362, that evidence was direct testimony that someone other than the plaintiff had committed the crime. In that case, we considered whether a plaintiff whose trial counsel had failed to call two percipient witnesses, who would have testified that the plaintiff was not the individual who committed the crime, was eligible to pursue a claim for compensation. *Id.* at 359-360. We determined that the omission of such exculpatory testimony was crucial to the plaintiff's defense of misidentification, and thus that allowing the motion for a new trial based on the failure to call those witnesses was a reversal on grounds that tended to establish innocence. *Id.* at 363-365.[20]

On the same day as our decision in *Guzman*, we considered

[20]Guzman was convicted of drug trafficking and conspiracy based on a theory of constructive possession of cocaine. His defense at trial was misidentification. The primary witnesses against him were two Boston police

the related circumstances in which a new trial was granted
because of the failure to introduce evidence that would have
challenged the credibility of two key prosecution witnesses. See
*Drumgold* v. *Commonwealth*, 458 Mass. 367, 376-377 (2010)
(*Drumgold*). Drumgold had been convicted of murder in the
first degree in the shooting death of a young girl who was
killed when several masked young men walked up to a group of
other young men and began shooting into the group. The Com-
monwealth's theory at trial was that the intended victim — not
the girl — had been targeted in revenge for an earlier shooting,
and that Drumgold, a friend of the earlier victim, was one of
the shooters. *Id.* at 370. The Commonwealth failed to disclose
that a key prosecution witness, who testified that, prior to the
shooting, he had seen Drumgold and another individual two
blocks from the scene, carrying guns, and inquiring as to the
whereabouts of the man identified as the intended target, had
been afforded promises and inducements to testify. *Id.* at 370-
371, 373-374. Moreover, posttrial, the Commonwealth learned
that another critical percipient witness, who had testified at trial
that, immediately after she heard gunshots, she saw Drumgold,
less than a block from the scene, climbing over a fence and
heading away from the scene, had been suffering from terminal
brain cancer at the time of the shooting, and that the illness had
resulted in blurred vision. *Id.* at 372-373.

We concluded that, while not directly exculpatory, the omis-
sion of the credibility evidence was a reversal on grounds tend-
ing to establish innocence, as the omitted evidence, which tended
to support Drumgold's defense of misidentification and alibi,
was "probative of the central issue at trial" and would have

detectives who testified that they had observed Guzman engaged in drug
sales. *Guzman*, *supra* at 363-364. The detectives subsequently pleaded guilty
to charges that they had created false search warrant affidavits and stolen cash
and drugs seized during searches conducted pursuant to those warrants. *Id.* at
357 n.5. Guzman's counsel did not call two individuals whom the detectives
testified they had observed purchasing cocaine from Guzman, *id.* at 363-364,
and who stated at Guzman's motion for a new trial that, had they been called
to testify, they would have said that the person from whom they had purchased
cocaine was not Guzman. Unknown to Guzman, the two purported buyers had
been represented by Guzman's trial counsel in proceedings against them. Guz-
man's motion for a new trial, on the ground that counsel had been ineffective
in not calling these witnesses due to this conflict of interest, was allowed. *Id.*

cast doubt on the identifications by the two witnesses. Thus, it went to the ultimate determination of Drumgold's guilt or innocence. *Id.* at 378.

On the other end of the spectrum, convictions that are reversed only because of "procedural or evidentiary errors or structural deficiencies at . . . trial[] that could well be 'consistent' with innocence without *any* tendency to establish it" would not meet the statutory definition (emphasis in original). *Guzman, supra* at 358. See *id* at 358 n.6, citing, e.g., *Commonwealth* v. *Williams,* 450 Mass. 894, 905-906 (2008) (conviction reversed on basis of misconduct by prosecutor during closing argument, including offering corroborating testimony and interjecting personal determinations of credibility); *Riley* v. *Commonwealth,* 82 Mass. App. Ct. 209, 215-216 (2012) (where conviction reversed solely due to error in admission of nontestifying codefendants' statements, see *Bruton* v. *United States,* 391 U.S. 123 [1968], claimant not eligible for relief under erroneous convictions statute).

As the parties recognize, this case falls between the circumstances in *Guzman, supra* at 363-365, and *Drumgold, supra,* where clearly exculpatory evidence was not available to the jury, and situations such as those discussed in *Guzman, supra* at 358 & n.6, in which convictions are reversed only because of "procedural or evidentiary errors or structural deficiencies at . . . trial[]." Relying on the specific circumstances in *Guzman* and *Drumgold,* the Commonwealth is of the view that only individuals whose convictions are reversed due to the failure to introduce exculpatory evidence at trial, or to the later discovery of such exculpatory evidence, are eligible for relief under the erroneous convictions statute. The Commonwealth maintains that Irwin's conviction, by contrast, was reversed solely due to the erroneous inclusion of "excessive" "inculpatory" evidence of consciousness of guilt, in violation of his right against self-incrimination, a ground requiring a new trial but not tending to establish his innocence under G. L. c. 258D, § 1 (B) (ii). See *Guzman, supra* at 358 & n.6.

Nothing in our decisions in those cases, however, compels such a result. That judicial relief must have been granted on "grounds which tend to establish the innocence" of a claimant does not limit the threshold question of eligibility for relief to

individuals whose convictions were vacated or reversed based on the failure to admit exculpatory evidence. Rather, an individual is eligible to pursue a claim for compensation if his conviction was reversed on "grounds resting upon facts and circumstances probative of the proposition that the claimant did not commit the crime." *Guzman, supra* at 362. "While we agree that the eligibility requirements of [G. L.] c. 258D were intended to limit the class of persons entitled to pursue relief, and in this sense perform a screening function, and that the relief granted must be on grounds tending to do more than merely assist the defendant's chances of acquittal, we do not discern a legislative intent that the determination of eligibility be tantamount to a testing of the merits of a claimant's case." *Guzman, supra* at 360-361.

Nor does the language of the erroneous convictions statute, "grounds which tend to establish the innocence of the individual," restrict compensation only to those whose convictions were overturned based on the deliberate exclusion of exculpatory evidence. To do so would be inconsistent with the legislative purpose in enacting the statute, that those erroneously convicted but factually innocent be afforded equal opportunities to obtain compensation. See Testimony of Representative Patricia Jehlen (who introduced the proposed wrongful conviction statute) to the Committee on Public Safety (Mar. 19, 2003), available at http://web.archive.org/web/20040807031601/http://patjehlen.org/2506testimony.html (last visited July 9, 2013); A. Wisneski, 'That's Just Not Right': Monetary Compensation for the Wrongfully Convicted in Massachusetts, 88 Mass. L. Rev. 138, 138-140, 151 & nn.177-180 (2004). See also *Guzman, supra* at 355 n.2.

Erroneous felony convictions of factually innocent defendants have been reversed on many grounds other than a failure to introduce exculpatory evidence. A century ago, a seminal study of erroneous convictions identified the sources of such convictions as including erroneous eyewitness testimony, false confessions, faulty circumstantial evidence, and prosecutorial excesses. See Borchard, European Systems of State Indemnity for Errors of Criminal Justice, 3 J. Am. Inst. Crim. L. & Criminology 684 (1913). Notwithstanding the advent of deoxyribonucleic acid

(DNA) testing, which brought the issue of false convictions to the fore,[21] those factors continue to underlie many erroneous convictions.[22] See Kahn, Presumed Guilty Until Proven Innocent: The Burden of Proof in Wrongful Conviction Claims Under State Compensation Statutes, 44 U. Mich. J.L. Reform 123, 128 (2010) (Kahn).[23]

Known erroneous convictions in Massachusetts, where the person convicted has later been determined to be "actually innocent," have arisen from the deliberate suppression of exculpatory evidence, but also from, inter alia, the admission of false inculpatory evidence. One study of thirty-three known erroneous convictions in Massachusetts showed that deliberate suppression of exculpatory evidence by police or prosecutors underlay twelve of the convictions. Fisher, Convictions of Innocent Persons in Massachusetts: An Overview, 12 B.U. Pub. Int. L.J. 1, 62-63 (2002). Perjury on the part of third-party witnesses, jailhouse informants, victims, or police also resulted in twelve erroneous convictions. Id. at 63.[24]

Misidentification by eyewitnesses, whether mistaken or

[21]See Gould & Leo, One Hundred Years Later: Wrongful Convictions After a Century of Research, 100 J. Crim. L. & Criminology 825, 828-831 (2010) (Gould), citing Gross, Jacoby, Matheson, Montgomery, & Patil, Exonerations in the United States 1989 Through 2003, 95 J. Crim. L. & Criminology 523, 528-529 (2005) (Gross).

[22]Some estimates suggest that, "out of the estimated 1,993,880 people convicted nationally each year, about 10,000 are erroneous" convictions of factually innocent defendants. See Wisneski, 'That's Just Not Right': Monetary Compensation for the Wrongfully Convicted in Massachusetts, 88 Mass. L. Rev. 138, 142-143 & nn.51-67 (2004), and studies cited.

[23]These and other studies have identified "eyewitness misidentifications, unreliability of testimony by jailhouse informants, false confessions, inadequate representation by defense attorneys, and improper practices by prosecuting attorneys" as the primary factors resulting in erroneous convictions. See Gould, supra at 828, citing M.L. Radelet, H.A. Bedau, & C.E. Putnam, In Spite of Innocence: Erroneous Convictions in Capital Cases (1992) (Radelet, Bedau, & Putnam), and others. See, e.g., Bedau & Radelet, Convicting the Innocent in Capital Cases: Criteria, Evidence, and Inference, 52 Drake L. Rev. 587 (2004); Radelet, Lofquist & Bedau, Prisoners Released from Death Row Since 1970 Because of Doubts About Their Guilt, 13 T.M. Cooley L. Rev. 907 (1996); Radelet & Bedau, The Execution of the Innocent, 61 Law & Contemp. Probs. 105 (1998); Radelet, The Role of Innocence Argument in Contemporary Death Penalty Debates, 41 Tex. Tech. L. Rev. 199 (2008).

[24]Nationally, an initial study of seventy-four erroneous convictions in which the person convicted was later exonerated by deoxyribonucleic acid (DNA)

through perjury, continues to be a significant factor in a large number of erroneous convictions.[25] See *Commonwealth* v. *Walker*, 460 Mass. 590, 604 n.16 (2011) (eyewitness testimony is "greatest source of wrongful convictions"); *Commonwealth* v. *Martin*, 447 Mass. 274, 293 & n.4 (2006) (Cordy, J., dissenting) ("There is no longer any doubt that mistaken eyewitness identification is the primary cause of erroneous convictions, outstripping all other causes combined . . ."). Across the United States, misidentification by eyewitnesses played a role in erroneous convictions in eighty-one per cent of the cases investigated.[26] See *Commonwealth* v. *Johnson*, 420 Mass. 458, 465 (1995) ("danger of mistaken identification by a victim or a witness poses a real threat to the truth-finding process of criminal trials. . . . Compounding this problem is the tendency of juries to be unduly receptive to eyewitness evidence").

"To date, virtually all postconviction DNA exonerations have occurred in rape or rape and murder cases." Gould & Leo, One Hundred Years Later: Wrongful Convictions After a Century of Research, 100 J. Crim. L. & Criminology 825, 829 n.20 (2010) (Gould), citing Gross, Jacoby, Matheson, Montgomery, & Patil, Exonerations in the United States 1989 Through 2003, 95 J. Crim. L. & Criminology 523, 528-529 (2005). In twenty-five per cent of rape cases submitted to the Federal Bureau of Investigation for DNA testing, the primary suspect identified by police was excluded as the perpetrator. Gould, *supra* at 830,

evidence concluded that approximately one-half of the convictions rested on false inculpatory evidence created by police and prosecutorial misconduct. B. Scheck, P. Neufeld, & J. Dwyer, Actual Innocence 365 (2003); Fisher, Convictions of Innocent Persons in Massachusetts: An Overview, 12 B.U. Pub. Int. L.J. 1, 62-63 (2002) (Fisher).

[25]A summary of several studies of erroneous convictions in Massachusetts concluded that, in over half of the cases where convicted defendants were later officially exonerated, the convictions involved mistaken identifications by eyewitnesses, including by multiple eyewitnesses who had had ample opportunity to observe the perpetrator. Fisher, *supra* at 64 & n.278, and sources cited.

[26]See Fisher, *supra* at 62, citing Radelet, Bedau, & Putnam, *supra* at 18-19. See generally E. Connors, T. Lundregan, N. Mill, & T. McEwen, Convicted by Juries, Exonerated by Science: Case Studies in the Use of DNA Evidence to Establish Innocence After Trial (1996); Frank & Frank, Not Guilty 86, 193-194 (1957); Bedau & Radelet, Miscarriages of Justice in Potentially Capital Cases, 40 Stan. L. Rev. 21, 56-65 & n.12 (1987).

citing E. Connors, T. Lundregan, N. Mill, & T. McEwen, Convicted by Juries, Exonerated by Science: Case Studies in the Use of DNA Evidence to Establish Innocence After Trial (1996). Despite the evident appeal and relative certainty of exoneration based on DNA evidence, however, in many circumstances, such as in Irwin's case, DNA evidence will be unavailable.[27] In enacting the erroneous convictions statute, the Legislature clearly recognized this reality, and did not, unlike some other jurisdictions, provide for compensation only where a defendant was exonerated based on DNA evidence. See Kahn, *supra* at 138 & n.62 (Missouri, Mo. Rev. Stat. § 650.058 [2007]; Montana, Mont. Code Ann. § 53-1-214 [2009]; and Vermont, Vt. Stat. Ann. tit. 13, § 5574 [2009], require exoneration by DNA evidence).[28]

Clearly, in some circumstances, inclusion of false inculpatory

---

[27] The rate of known eyewitness misidentification in erroneous conviction cases involving certain other crimes of stranger violence, such as robbery, where mistaken identification is likely, suggests that, were DNA evidence generally available for those types of offenses, the number of exonerations might be orders of magnitude higher. See Gross, *supra* at 530-531 ("[A] detailed study analyzed all known cases of eyewitness misidentification in the United States from 1900 through 1983 . . . . That study found that misidentifications in robberies outnumbered those in rapes by more than two to one; in fact, robberies accounted for more than half of all known cases of proven misidentifications. The pattern in [a study of DNA exonerations] could hardly be more different. [Of the 121 DNA exonerations] in rape cases, . . . in [eighty-eight per cent], the defendant was the victim of eyewitness misidentifications"; of six DNA exonerations for robbery, all six included eyewitness misidentifications).

[28] A majority of States have enacted erroneous compensation statutes in some form. See Swedlow, Don't Believe Everything You Read: A Review of Modern "Post-Conviction" DNA Testing Statutes, 38 Cal. W. L. Rev. 355, 355 (2002). See, e.g., Autry, Connick v. Thompson: The Costs of Valuing Immunity over Innocence, 69 Nat'l Law. Guild Rev. 29 (2012); Brooks & Simpson, Find the Cost of Freedom: The State of Wrongful Conviction Compensation Statutes Across the Country and the Strange Legal Odyssey of Timothy Atkins, 49 San Diego L. Rev. 627, 633 (2012); McKneelen, "Oh Lord Won't You Buy Me a Mercedes Benz?": A Comparison of State Wrongful Conviction Compensation Statutes, 15 Scholar 185, 186-187 (2013); Owens & Griffiths, Uneven Reparations for Wrongful Convictions: Examining the State of Politics of State Statutory Compensation Legislation, 75 Alb. L. Rev. 1283, 1287 (2011-2012).

"Nine states allow actions by claimants who were released on grounds of innocence or grounds consistent with innocence." Kahn, Presumed Guilty Until Proven Innocent: The Burden of Proof in Wrongful Conviction Claims

evidence, such as deliberately perjured testimony by an arresting officer, could be a ground tending to establish innocence. Moreover, and notwithstanding the Commonwealth's argument to the contrary, the presence of an error requiring reversal on procedural or structural grounds does not itself preclude a determination that a conviction was reversed on grounds tending to establish innocence.[29] The Commonwealth's argument misconstrues our discussion in *Guzman* of circumstances that, without more, would require a new trial but would not tend to establish innocence. See *Guzman, supra* at 358 n.6. It would be absurd to conclude that, for instance, where exculpatory alibi evidence was deliberately omitted, and the prosecutor also argued improperly during closing argument that he believed one of the witnesses' stories, a claimant would be ineligible to pursue a claim for relief, or that any improprieties in the closing argument should be disregarded in evaluating the grounds on which the claimant's conviction was overturned.[30] See *Drumgold, supra* at 377-378.

---

Under State Compensation Statutes, 44 U. Mich. J.L. Reform 123, 137-138 & n.63 (2010). "Nine states, the District of Columbia, and the federal government require only that the conviction has been reversed or vacated and the claimant was either not retried or was retried and acquitted." *Id.* at 138 & n. 64. "[T]wo states do not have any restrictions on who can bring a claim." *Id.* at 138 & n.65.

[29] In *Drumgold, supra* at 377-378, this court stated:

> "We do not agree with the Commonwealth that a decision based on grounds implicating fair trial rights precludes us from inquiring whether those grounds rest on facts and circumstances probative of the proposition that the defendant did not commit the crime. Nor is it necessary that the judge granting relief make any specific finding as to the likely innocence of the defendant in order for him to be eligible to bring an action under [G. L.] c. 258D. Implicit in the judge's allowance of the Commonwealth's motion for a new trial was her recognition that the newly discovered evidence relating to [one of the Commonwealth's witnesses] and the undisclosed evidence related to [another witness] were probative of the central issue at trial: the reliability of the identification of Drumgold as one of the shooters and, correspondingly, the veracity of his alibi defense. Drumgold's guilt turned on the jury accepting the testimony of [those witnesses] as being credible and rejecting the testimony of the defendant and others as to the defendant's alibi."

[30] In further support of this argument, the Commonwealth maintains that, at any trial pursuant to G. L. c. 258D, the "inculpatory" evidence on which

We turn to the reasons for the reversal of Irwin's conviction. Irwin's conviction was overturned based on improperly introduced evidence of his prearrest silence, and emphasis by the prosecutor on that silence as evidence of consciousness of guilt. See *Irwin*, *supra* at 654-655. The Commonwealth insists repeatedly that evidence of Irwin's delay in communicating with police was "inculpatory" evidence of consciousness of guilt. An individual who has not been arrested or charged, however, may choose not to speak with police for a myriad of reasons. See *Commonwealth* v. *Nickerson*, 386 Mass. 54, 61-62 (1982); *Irwin*, *supra* at 649, and cases cited. Evidence of a defendant's prearrest silence may be introduced against him at trial to establish consciousness of guilt only where it would be reasonable to expect that an ordinary person would speak; a defendant's prearrest silence may be used for impeachment purposes only if it would have been "natural" for a person in the circumstances to choose to speak. *Commonwealth* v. *Nickerson*, *supra* at 62.[31]

"Consciousness of guilt instructions are permissible when

Irwin's conviction was overturned would be admissible in accordance with G. L. c. 258D, § 1 (F), ("No evidence proffered by any party shall be excluded on grounds that it was seized or obtained in violation of the Fourth, Fifth or Sixth amendments to the Constitution of the United States . . ."). The Commonwealth urges that the admissibility provisions of G. L. c. 258D, § 1 (F), indicate a legislative intent to screen out as ineligible any claimant whose conviction was overturned, even in part, on grounds that evidence was introduced in violation of his constitutional rights, which would be admissible at a trial on a compensation claim. This argument disregards the evidentiary rule that, at any trial, to be admissible, evidence must be relevant and probative. Irwin's prearrest silence was neither. *Commonwealth* v. *Irwin*, 72 Mass. App. Ct. 643, 649-650 (2008) (*Irwin*).

[31]In *Salinas* v. *Texas*, 133 S. Ct. 2174, 2180-2183 (2013), the United States Supreme Court upheld a conviction in which the defendant's prearrest silence was introduced in the government's case-in-chief as evidence of consciousness of guilt because the defendant had not explicitly invoked his rights under the Fifth Amendment to the United States Constitution. As we noted in *Commonwealth* v. *Nickerson*, 386 Mass. 54, 59 (1982), citing *Jenkins* v. *Anderson*, 447 U.S. 231, 239 (1980), however, the Court "has held that a defendant's prearrest silence may be used to impeach him without denying fundamental fairness guaranteed by the Fourteenth Amendment" but "has left it to the States to determine their own rules of evidence when prearrest silence is so inconsistent with a defendant's testimony that impeachment by reference to that silence is probative." In *Commonwealth* v. *Nickerson*, *supra*, a case in which the defendant made no claims under the Massachusetts Constitution

there is an 'inference of guilt that may be drawn from evidence of flight, concealment, or similar acts,' such as false statements to the police, destruction or concealment of evidence, or bribing or threatening a witness." *Commonwealth* v. *Stuckich*, 450 Mass. 449, 453 (2008), quoting *Commonwealth* v. *Toney*, 385 Mass. 575, 584 & n.4 (1982). Here, there was no such evidence. "That the defendant said that he would call [the detective] back or have his attorney do so, and that [the detective] never heard again from anyone, is not a sufficient evidentiary foundation to support [a consciousness of guilt] instruction." *Commonwealth* v. *Stuckich*, *supra* at 453.

The Commonwealth's argument that Irwin's prearrest silence is "inculpatory evidence" miscasts evidence that was simply not probative or relevant, see *id.*, and should not have been admitted.[32] "Although pre-arrest silence may reflect negatively on a defendant's trial testimony, that silence may be entirely unrelated to the truth or falsity of his testimony." *Commonwealth* v. *Nickerson*, *supra* at 61 n.6. It is far from clear that, as the prosecutor argued, an innocent person would have been eager to speak with police in these circumstances. Any defendant who had watched a police crime drama on television would be likely to know that, whatever he told police, the trial would devolve into a question of the complainant's and the defendant's credibility. Indeed, when police attempted to speak with the uncharged Closker about the incident, he declined to meet with them. *Irwin*, *supra* at 647 n.9. Moreover, as a person who was then homeless and who had three prior convictions, for unrelated

and which we decided on common-law grounds, we stated, "Because evidence of a defendant's pretrial silence may have a disproportionate impact upon the minds of the jurors and because the potential for prejudice inherent in such evidence outweigh(s) its marginal probative worth, we conclude that the use of such evidence for impeachment purposes cannot be justified in the absence of unusual circumstances." *Id.* at 62, quoting *People* v. *Conyers*, 52 N.Y.2d 454, 459 (1981). Nothing in the Court's decision in *Salinas* v. *Texas*, *supra*, gives us reason to reconsider our conclusion in *Commonwealth* v. *Nickerson*, *supra*.

[32]Evidence of a defendant's refusal to participate in a police interview is admissible on cross-examination of a defendant only where the defendant "opens the door" to that inquiry in some way during his direct testimony, such as by testifying that he cooperated with the investigation. See *Commonwealth* v. *Johnson*, 46 Mass. App. Ct. 398, 405-406 (1999). This Irwin did not do. See *Irwin*, *supra* at 653 n.15.

types of offenses, Irwin could well have had many reasons based on prior experience for his apparent reluctance to speak with police.

Thus, as the Appeals Court discussed, nothing in the evidence of Irwin's prearrest silence went toward establishing any element of the Commonwealth's case. See *Irwin, supra* at 656. The improperly admitted evidence, however, and the closing argument based thereon, went to the heart of Irwin's defense of misidentification and deprived the jury of the ability to weigh and consider fairly the evidence that Irwin committed the offense charged. Cf. *Drumgold, supra* at 377-379. Thus, Irwin was deprived of a fair trial, and a new trial was required.

The power of the improperly admitted evidence is starkly demonstrated by the differing outcomes at Irwin's two trials, conducted two days apart, by the same attorneys and before the same judge. Irwin's first trial, on October 18, 2005, ended in a mistrial when the jury were unable to reach a verdict. His second trial began on October 20. Irwin again testified in his own defense. While evidence of his prearrest silence had been elicited at his first trial, it was emphasized at his second trial. On cross-examination, Irwin was asked repeatedly why he did not attend the scheduled interview in September, 2003; whether he was "frightened" or "alarmed" when he learned the reason Potter wanted to speak with him; and whether, on learning the nature of the allegations, he "must have wanted to speak with the detective right away." *Irwin, supra* at 652. The prosecutor emphasized the delay of three months between September and December, and suggested that it would have been natural ("one would think that you must have wanted to speak with the detective right away. Yes?") to want to speak with police if one were innocent of the allegations. *Id.* at 652-653. Unlike Irwin's first trial, where this line of questioning was not mentioned during the prosecutor's closing argument, at his second trial, the prosecutor relied heavily on the argument that an innocent person would have spoken to police. See *id.* at 654 (argument was "a theme of the closing"). Irwin was convicted on October 21.

Nonetheless, because the improperly admitted evidence was not probative and not relevant to establish any fact at trial, its exclusion also did not change the weight of the properly admitted evidence. While we do not preclude the possibility of situa-

tions where the improper admission of evidence of a defendant's silence, and closing argument based thereon, could also be grounds tending to establish a defendant's innocence, in the circumstances here, the exclusion of the improper evidence would not have tended to make it more likely that Irwin did not commit the offense charged. Without the improper evidence, the jury would have had before it the claimant's statements of accusation, and Irwin's statements of denial. Although the impermissible evidence could well have contributed to an unfair and erroneous weighing of Irwin's statements by the jury, the exclusion of the nonprobative and irrelevant evidence would have had no bearing on the weight of the remaining evidence, which would have been, as before, confined largely to the complainant's statements and Irwin's statements.

In many circumstances, as here, a conviction reversed because of the inclusion of nonprobative, but highly prejudicial, evidence related to a defendant's prearrest silence would not "rest[] upon facts and circumstances probative of the proposition that the claimant did not commit the crime." *Guzman, supra* at 362. The admission of Irwin's prearrest silence, while highly prejudicial, was not probative of any fact, but neither does the exclusion of this highly prejudicial evidence make the complaint's allegations more or less likely. In these circumstances, ordering a new trial based on the improper evidence of Irwin's prearrest silence was not a reversal of Irwin's conviction on grounds "probative of the proposition that [Irwin] did not commit the crime." *Guzman, supra.*

*Conclusion.* We conclude that Irwin's conviction was not overturned on grounds tending to establish his innocence. Thus, he is not an eligible claimant under G. L. c. 258D, § 1 (B) (ii). The order denying the Commonwealth's motion to dismiss is vacated and set aside. The order allowing partial judgment on the pleadings is vacated and set aside. The case is remanded to the Superior Court, where judgment shall enter for the Commonwealth.

*So ordered.*